IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

SHEILA ECKERT,           )
                             )
        Plaintiff,       )
                             )
        v.           )     Case No.
                             )     15-4275-CV-C-REL-SSA
NANCY A. BERRYHILL, Acting   )
Commissioner of Social Security,   )
                             )
        Defendant.      )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sheila Eckert seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in finding that she

was not disabled because plaintiff needs to take rest breaks up to four hours during the

day due to auras and she has to stay in bed all day two to three days a week on her

bad days. I find that the substantial evidence in the record as a whole supports the

ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary

judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On February 12, 2013, plaintiff applied for disability benefits alleging that she

had been disabled since December 1, 2010, later amended to August 31, 2012 (the day

after the ALJ's decision in her prior disability case). Plaintiff's disability stems from

depression, epilepsy, headaches, irritable bowel syndrome, celiac disease (gluten

sensitivity), asthma, and hypothyroidism. Plaintiff's application was denied on March

12, 2013. On June 10, 2014, a hearing was held before an Administrative Law Judge.

On July 25, 2014, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 1, 2015, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of

choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

Case 2:15-cv-04275-REL   Document 27   Filed 03/27/17   Page 3 of 26

2.	Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.	Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.	Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.	Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.	THE RECORD

The record consists of the testimony of plaintiff and vocational expert Deborah Determan, in addition to documentary evidence admitted at the hearing.

## A.	ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1991 through 2013, shown in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|---|---|---|
| 1991 | $ 673.57 | $ 1,276.48 |
| 1992 | 0.00 | 0.00 |
| 1993 | 7,691.81 | 13,744.23 |

4

| | | |
|---|---|---|
| 1994 | 6,678.00 | 11,620.80 |
| 1995 | 3,438.49 | 5,752.93 |
| 1996 | 7,820.26 | 12,474.01 |
| 1997 | 9,027.00 | 13,605.00 |
| 1998 | 6,048.00 | 8,661.87 |
| 1999 | 3,774.95 | 5,121.05 |
| 2000 | 9,101.20 | 11,699.58 |
| 2001 | 6,343.39 | 7,964.42 |
| 2002 | 5,026.75 | 6,248.65 |
| 2003 | 5,115.42 | 6,207.13 |
| 2004 | 9,386.72 | 10,884.03 |
| 2005 | 9,899.98 | 11,073.96 |
| 2006 | 5,876.52 | 6,284.53 |
| 2007 | 3,129.12 | 3,201.10 |
| 2008 | 5,737.11 | 5,737.11 |
| 2009 | 3,298.63 | 3,298.63 |
| 2010 | 4,356.81 | 4,356.81 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |

(Tr. at 136-137).

**Function Report**

In a Function Report dated March 5, 2013, plaintiff reported that when she feels OK she will cook and load/unload the dishwasher (Tr. at 176).  She reported that her "body hurts from fibromyalgia, migraines, meds side effects, pain in head, IBS - constantly using restroom" (Tr. at 176).  Plaintiff did not indicate whether her condition impacts her ability to dress, bathe, care for her hair, shave, feed herself, etc. (Tr. at 176).  Most of plaintiff's answers on this form were "depends on how I feel" (Tr. at 176-

5

182).  Depending on how she feels, plaintiff will sometimes go to the movies or to Wal-Mart with friends (Tr. at 179).

## B.    SUMMARY OF TESTIMONY

During the June 10, 2014, hearing, plaintiff testified; and Deborah Determan a vocational expert, testified at the request of the ALJ.

## 1.    Plaintiff's testimony.

At the time of the hearing plaintiff was 41 years of age and is currently 43 (Tr. at 34).  Plaintiff lives with her husband and two daughters, ages 16 and 13 (Tr. at 34).  Plaintiff has a high school education (Tr. at 35).

Plaintiff last worked in December 2010 as a school health aid (Tr. at 35).  Prior to that she was a bank teller for a year, and she was a hair stylist before that (Tr. at 35).

Plaintiff has a vagus nerve stimulator[1] ("VNS") implanted, and she had to use it twice last month (Tr. at 37).  She did not go into a full-blown grand mal seizure because she used the stimulator as soon as she felt the seizure coming on (Tr. at 37).

---

[1]Vagus nerve stimulation is a procedure that involves implantation of a device that stimulates the vagus nerve with electrical impulses.  There is one vagus nerve on each side of your body, running from your brainstem through your neck to your chest and abdomen.  In conventional vagus nerve stimulation, a device is surgically implanted under the skin on your chest, and a wire is threaded under your skin connecting the device to the left vagus nerve.  When activated, the device sends electrical signals along the vagus nerve to your brainstem, which then sends signals to certain areas in your brain.  A vagus nerve stimulator is used to treat epilepsy.  People who have an implanted vagus nerve stimulator will have a magnet that can be used at the time of the seizure. The vagus nerve stimulator provides stimulation on its own; however, many people find that it can help stop a seizure or lessen the severity or length of a seizure if the magnet is applied at the time of the seizure.
http://www.mayoclinic.org/tests-procedures/vagus-nerve-stimulation/home/ovc-2016775
5; http://www.epilepsy.com/get-help/seizure-first-aid/using-vns-magnet

6

Sometimes plaintiff gets a little slurred speech or blind spots, she gets limp and needs to lie down (Tr. at 37). She has to lie down for about four hours when she has a mild one (Tr. at 37). She had two of these the previous month, and the month before that she had several and they were stronger but she learned that her implant battery had gone dead (Tr. at 37). So she was having full blown seizures and had to have the battery replaced (Tr. at 38).

Plaintiff was asked to describe the auras she experiences due to her epilepsy -- she gets dizzy on days when she does not have seizures, some days are bad and she gets wobbly when she stands so she spends the day in bed, and she is forgetful (Tr. at 40). Plaintiff has two to three bad days per week (Tr. at 41).

Plaintiff has headaches at least three times a week (Tr. at 38-39). She takes Relpax for migraines and Ambien for sleeping, even though that does not help very much (Tr. at 39). Plaintiff uses the restroom four to five times a day due to irritable bowel syndrome (Tr. at 39). Plaintiff takes Sertraline for depression (Tr. at 40).

When plaintiff has a headache, she usually vomits and is in bed all day (Tr. at 44). The next day she feels hung over (Tr. at 44). Plaintiff has problems with concentration -- she tries to stay on task doing chores or answering questions, but she feels like she is repeating herself or doesn't know the right words (Tr. at 44-45).

Plaintiff is very close to her mother who lives about five miles away (Tr. at 41). Plaintiff sees her mother several times a week (Tr. at 41). Plaintiff can bathe and dress by herself (Tr. at 41). She has a valid driver's license and last drove a couple weeks

before the hearing[2] (Tr. at 41).  When asked if her doctor had recommended that she not drive, plaintiff said, "Well, if I have a seizure, I cannot. I mean, at least six months for sure.  If I have a full blown seizure, six months." (Tr. at 41).

Plaintiff is able to load the dishwasher (Tr. at 42).  She can load the washer and dryer (Tr. at 42).  Plaintiff cooks about twice a week (Tr. at 42).  On a typical day, plaintiff wakes up sometime between 9:00 to 10:00 (Tr. at 43).  If plaintiff is feeling OK, she will take a shower (Tr. at 43).  If she is dizzy, she will wait until someone is home before she takes a shower (Tr. at 43).  Plaintiff watches some television (Tr. at 43).  If she is tired, she will nap (Tr. at 43).  She usually  naps every day (Tr. at 43).  She goes to bed around 9:00 or 10:00 p.m. (Tr. at 43).

## 2.    Vocational expert testimony.

Vocational expert Deborah Determan testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could perform light work with occasional forward or overhead reaching with the left arm; must avoid concentrated exposure to irritants such as fumes, odors, dusts, and gases.  The person must avoid all use of hazardous machinery and all exposure to unprotected heights. The person would be limited to simple, routine, repetitive tasks with an SVP of no greater than 2. There should be no strict production quota with the emphasis being on a per shift rather

---

[2]According to plaintiff's medical records, she told Janet Samuels, a nurse practitioner at Neurology, Inc., that she had a seizure on April 10, 2014, during which she "went down and wet herself" and had nausea and vomiting (Tr. at 308).  April 10, 2014, was about a month and a half before plaintiff drove, according to her testimony.

8

than a per hour basis (Tr. at 47).  The vocational expert testified that such a person

could not perform plaintiff's past relevant work as a bank teller, cosmetologist, or

nurse's aide (Tr. at 47).  The person could work as a counter clerk, DOT 249.366-010,

with 300 jobs in Missouri and 18,000 in the country; furniture rental clerk, DOT 295.357-

018, with 250 jobs in Missouri and 19,000 in the country, or shipping and receiving

waiter, DOT 222.387-074 with 40 jobs in Missouri and 2,000 in the country (Tr. at 48).

The second hypothetical was the same as the first except the person would be

off task 20% of the day in addition to regularly-scheduled breaks; the third hypothetical

involved a person with two or more unexcused or unscheduled absences per month (Tr.

at 48).  Both hypothetical individuals would be unable to work (Tr. at 48-49).

## C.    SUMMARY OF MEDICAL RECORDS

On September 21, 2011, plaintiff saw David McLaren, M.D., at Neurology, Inc.

(Tr. at 379-382).  She reported headaches more than 15 days per month.

On February 2, 2012, plaintiff saw David McLaren, M.D., at Neurology, Inc., who

noted that plaintiff had reported chronic migraine headaches at least 15 days per month

lasting at least 4 hours in duration (Tr. at 363-364).  He administered BOTOX[3]

injections.

On February 27, 2012, prior to the time period covered by this case, plaintiff told

Juan Pineda, M.D., that she "has seizures and has not been able to work.  Her last

---

[3]BOTOX to treat chronic migraines is given at intervals of about 12 weeks as
multiple injections around the head and neck to try to dull future headache symptoms.

9

seizure was not long ago. She has applied for disability." (Dr. Pineda did not treat plaintiff for seizures, Dr. McLaren is her neurologist.)

On May 2, 2012, plaintiff had an occipital nerve block[4] for headaches (Tr. at 354-359). "Called yesterday, leaving town on Thursday for a week, per car, and had had a headache for the last month, but worse in the last week."

On May 17, 2012, plaintiff saw David McLaren, M.D., for BOTOX injections due to "chronic daily migraines." (Tr. at 351-353).

On June 14, 2012, plaintiff saw David McLaren, M.D., and said her "seizures are under good control. Headaches are better with Botox injections but still a problem for her." (Tr. at 345-348).

On August 30, 2012, an ALJ found plaintiff not disabled in her previous disability case.

August 31, 2012, is plaintiff's alleged onset date in this case.

On September 6, 2012, plaintiff saw Yvonne Gulino, a nurse practitioner, complaining of sinus pressure (Tr. at 273-276). Her symptoms were described as mild. "Generally not feeling well. Is currently trying for disability for seizure disorder. Is taking meds for that. Not working right now due to seizure problems." On exam plaintiff's overall appearance was noted to be normal. No abnormalities were noted except tenderness associated with a sinus infection. An antibiotic was prescribed.

_____

[4]An occipital nerve block is an injection of a steroid or other medication around the greater and lesser occipital nerves that are located on the back of the head just above the neck area.

On September 10, 2012, plaintiff saw Julie Stansfield, M.D., complaining of fatigue (Tr. at 269-272). She indicated she was not sleeping well and her fatigue was associated with her sleeping problems. "States she is following her diet carefully. Rare diarrhea anymore." Plaintiff's celiac sprue (gluten sensitivity) was noted to be stable. She was assessed with fatigue. "Discussed in clear detail her fibromyalgia will improve the most with daily activity and good sleep."

On December 12, 2012, plaintiff saw Yvonne Gulino, a nurse practitioner, for an annual well-woman exam (Tr. at 262-265). Plaintiff's overall appearance was normal, her physical exam was normal.

On December 18, 2012, plaintiff saw Julie Stansfield, M.D., and complained of sinus problems including a headache for the past two to three weeks, worse with weather change (Tr. at 258-261). She also said her muscle aches had been worsening over the past month which was "typical of her symptoms." On exam plaintiff's overall appearance was noted to be normal. Her entire physical exam was normal, and her memory was specifically noted to be normal. She was assessed with sinus infection. With respect to her fibromyalgia, the report says, "Suspect with treatment of sinusitis pain will reduce, call if this does not occur."

On December 19, 2012, plaintiff saw Janet Samuels, a nurse practitioner at Neurology, Inc. (Tr. at 241-244, 277-278, 341-344). Plaintiff complained of having headaches three times a week. "No seizures." Plaintiff said she felt tight in the neck area, the back of her head was sore so that it hurt to lie on it. Plaintiff said she had to stop BOTOX injections due to a change in insurance. Plaintiff denied any other

problems.  She denied dizziness, vertigo, lightheadedness, fainting, decrease in

consciousness, decrease in concentrating ability, confusion, disorientation, memory

lapses or loss, convulsions, focal disturbances, speech difficulties, problems with

balance and coordination (Tr. at 243).  She denied anxiety, depression and sleep

disturbances (Tr. at 243).  Plaintiff was observed to be in no acute distress.  "No

decrease in concentrating ability was observed.  No disorientation was observed.

Memory was unimpaired." (Tr. at 243).  Gait and stance were normal.  Her ability to pay

attention was normal (Tr. at 244).  She was assessed with common migraine (without

aura),[5] chronic common migraine (without aura), chronic daily headache, partial

complex seizure with secondary generalization with intractable seizure, and occipital

neuralgia.[6]  Plaintiff was told to continue her medications.  "Offered occipital blocks as

they have been helpful in past.  She is not sure if insurance will pay.  Suggested calling

and seeing what copay would be."  Plaintiff was also told to find out if her new

insurance would pay for BOTOX for chronic migraines as that treatment had been

helpful in the past.  Plaintiff was told to return in six months.

_____

[5]"Migraine *with* aura (plaintiff's diagnosis was *without* aura) is a headache that
strikes after or along with sensory disturbances called aura. These disturbances can
include flashes of light, blind spots and other vision changes or tingling in your hand or
face."
http://www.mayoclinic.org/diseases-conditions/migraine-with-aura/home/ovc-20201089
(emphasis added).

[6]Irritation of an occipital nerve causing the scalp to become extremely sensitive to
touch.
http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/nervous_system_disorder
s/Occipital_Neuralgia_22,OccipitalNeuralgia/

Case 2:15-cv-04275-REL   Document 27   Filed 03/27/17   Page 12 of 26

Lab work done this day showed a lower-than-expected level of lamictal (anticonvulsant) in plaintiff's blood (<0.9, the expected range was 3.0-15.0) (Tr. at 246, 290). Plaintiff's thyroid tests were normal (Tr. at 257).

On January 8, 2013, plaintiff saw Juan Pineda, M.D. (Tr. at 287). According to plaintiff, "her seizure medication is not working and her neurologist is concerned about possible malabsorption." Dr. Pineda ordered blood work to address the question of malabsorption of prescription medication.

On March 20, 2013, plaintiff saw David McLaren, M.D., at Neurology, Inc. (Tr. at 336-340). "Feeling bad, headaches three times a week, no seizures. Seizures not a problem." During a review of systems plaintiff denied abdominal pain, diarrhea, increase in urinary frequency, dizziness, vertigo, lightheadedness, fainting, problems with concentrating, confusion, disorientation, memory lapses or loss, convulsions, focal disturbances, speech difficulties, balance difficulties, coordination difficulties, anxiety, depression and sleep disturbances. On exam her cervical spine motion was tight and she had two positive trigger points. Her concentration was normal, memory was normal, language was normal, gait was normal, attention was normal. Plaintiff had a suboccipital nerve block.

On April 2, 2013, plaintiff saw Julie Stansfield, M.D., for symptoms of a urinary tract infection (Tr. at 291-295). Her overall appearance was noted to be normal. Her physical exam was normal, and her memory was noted to be normal. She was prescribed antibiotics.

On April 3, 2013, plaintiff saw David McLaren, M.D., at Neurology, Inc. (Tr. at 331-335). Plaintiff reported daily headaches that she rated a 7 out of 10 in severity. Plaintiff said she had previously gotten BOTOX which reduced her headaches by more than 50% in frequency and 50% in severity. He performed BOTOX injections as treatment for chronic migraine headaches.

On July 1, 2013, plaintiff saw David McLaren, M.D., at Neurology, Inc. (Tr. at 329-330). He performed BOTOX injections as treatment for chronic migraine headaches.

On July 8, 2013, plaintiff saw Juan Pineda, M.D., and reported diarrhea and abdominal pain (Tr. at 447). "She is waiting for a court hearing regarding her seizure disorder and disability. She has been taking Lomotil without improvement of her diarrhea." Dr. Pineda performed no exam. He told plaintiff to continue with her same medication.

On September 18, 2013, plaintiff saw Juan Pineda, M.D., for a follow up (Tr. at 447). "Her diarrhea is improved, but she still has some seizures as well as migraines." Plaintiff's physical exam was normal. She was told to continue on her same medications and return in six months.

On September 25, 2013, plaintiff saw David McLaren, M.D., at Neurology, Inc., for a follow up (Tr. at 321-328). "Feeling bad, headaches three times a week. No seizures. Seizures not a problem." Despite this notation, the record goes on: "She had called previously to report small seizures." Plaintiff's blood work was done and it was determined that the level of Lamictal in her blood was negligible. Plaintiff denied

14

malaise, abdominal pain, diarrhea, increase in urinary frequency, dizziness, vertigo, lightheadedness, fainting, decrease in concentrating ability, confusion, disorientation, memory lapses or loss, convulsions, focal disturbances, speech difficulties, difficulty with balance, difficulty with coordination, anxiety, depression and sleep disturbances. On exam plaintiff's cervical spine motion was tight, she had two positive trigger points. Her concentration was normal, memory was unimpaired, speech was normal, attention was normal, gait was normal. Dr. McLaren gave plaintiff BOTOX injections. "I questioned her about her medication compliance. Not sure that she is but she says that she is."

On December 30, 2013, plaintiff saw David McLaren, M.D., at Neurology, Inc. (Tr. at 317-320). Plaintiff complained of feeling bad, having headaches three times a week. "No seizures. Seizures not a problem." During a review of systems, plaintiff denied malaise, abdominal pain, diarrhea, increase in urinary frequency, dizziness, vertigo, lightheadedness, fainting, decrease in concentrating ability, confusion, disorientation, memory lapses or loss, convulsions, focal disturbances, speech difficulties, balance difficulties, coordination difficulties, anxiety, depression and sleep disturbances. On exam plaintiff's cervical spine motion was tight and she had two positive trigger points. Her concentration was normal, memory was unimpaired, gait was normal, attention was normal. Dr. McLaren reviewed plaintiff's blood work. "I questioned her about her medication compliance. Not sure that she is but she says that she is." Plaintiff's Lamictal was decreased. "I've done just about everything I can

think of to do about her headaches." It was recommended that plaintiff contact one of two headache clinics in Springfield and St. Louis.

On January 29, 2014, plaintiff saw Yvonne Gulino, a nurse practitioner, for cold symptoms (Tr. at 296-299). She was assessed with a sinus infection and was prescribed an antibiotic. There was no mention of seizures in this record.

On February 18, 2014, plaintiff saw Julie Stansfield, M.D., complaining of a rash (Tr. at 300-303). Her physical exam was normal including her memory. She was assessed with shingles. There were no reports of seizures in this record.

On April 1, 2014, plaintiff saw Janet Samuels, a nurse practitioner at Neurology, Inc. (Tr. at 313-316). Plaintiff complained of a lot of daily headaches. "Has headache today and it took a while for the Maxalt to work, wants to go back to the Relpax as it is faster for her. . ." Plaintiff said she had a seizure at her mom's house a week ago. "Says went down and wet self and was N/V [nausea/vomiting]. Magnet did not seem to effect her/she did not feel it." During a review of systems plaintiff denied malaise, abdominal pain, diarrhea, increase in urinary frequency, dizziness, vertigo, lightheadedness, fainting, decrease in concentrating ability, confusion, disorientation, memory lapses or loss, convulsions, focal disturbances, speech difficulties, balance difficulties, coordination difficulties, anxiety, depression and sleep disturbances. On exam her cervical spine motion was tight, she had two positive trigger points. Her memory was noted to be unimpaired, and no language abnormalities were demonstrated. Gait was normal. Attention was normal. Plaintiff's VNS was tested and

16

was determined to be "dead." The record indicates that plaintiff had a seizure "last week." A replacement VNS was ordered.

On April 14, 2014, plaintiff saw Janet Samuels, a nurse practitioner at Neurology, Inc. (Tr. at 308-312). Plaintiff complained of a lot of daily headaches.

> VNS dead and sent for replacement. . . . Had VNS replacement on 4/11/14. Had a spell on 4/10/14 with syncope. No shaking. Headache after, had to sleep and was ok thereafter. No problems with replacement.

During a review of systems, plaintiff denied malaise, diarrhea, abdominal pain, increase in urinary frequency, musculoskeletal symptoms, dizziness, vertigo, lightheadedness, fainting, decrease in consciousness, decrease in concentrating ability, confusion, disorientation, memory lapses or loss, convulsions, focal disturbances, speech difficulties, writing difficulties, problems with balance and coordination, anxiety, depression, and sleep disturbances. On exam she was noted to have tight cervical spine motion and two positive trigger points. "No decrease in concentrating ability was observed. No disorientation was observed. Memory was unimpaired." Her gait was normal; attention was normal. Plaintiff was told to continue her medications.

On April 15, 2014, plaintiff saw Juan Pineda, M.D., for a follow up (Tr. at 447). "She is doing well. She is asking about probiotics and she also wants to lose some weight." Her physical exam was normal. She was told to return in four to six months.

On April 24, 2014, plaintiff saw Janet Samuels, a nurse practitioner at Neurology, Inc., for bilateral occipital nerve blocks (Tr. at 448-453). "No new symptoms or concerns." During a review of systems, plaintiff denied malaise, abdominal pain, diarrhea, dizziness, vertigo, lightheadedness, fainting, decrease in concentrating ability,

confusion, disorientation, memory lapses or loss, convulsions, focal disturbance, speech difficulties, difficulties with balance or coordination, anxiety, depression, and sleep disturbance. On exam plaintiff's cervical spine motion was tight and she had two positive trigger points. Her concentration was normal, memory was unimpaired, speech was normal, coordination was normal, gait was normal, attention was normal.

On June 2, 2014, plaintiff saw Janet Samuels, a nurse practitioner at Neurology, Inc. (Tr. at 455-459). "The occipital blocks helped a lot. No tenderness in scalp or occipital area. . . . 1-2 headaches a week. A couple of minor spells since here. 'Felt off'. One may have been related to heat and dehydration. No new symptoms. Magnet used several times end of April but only 2 times in May. None in 2 weeks." During a review of systems plaintiff denied malaise, abdominal pain, diarrhea, increase in urinary frequency, dizziness, vertigo, lightheadedness, fainting, decrease in concentrating ability, confusion, disorientation, memory lapses or loss, convulsions, focal disturbances, speech difficulties, problems with balance or coordination, anxiety, depression, and sleep disturbances. On exam her cervical spine motion was tight and she had two positive trigger points. Her concentration was normal, memory was unimpaired, speech was normal, gait was normal, coordination was normal, attention was normal.

On June 18, 2014, David McLaren, M.D., from Neurology, Inc., wrote a letter to plaintiff's counsel (Tr. at 454).

> Mrs. Eckert has been a patient of mine for several years. She suffers from seizures as well as significant migraine headaches. In my opinion, the patient is unable to compete in the competitive work force and is unable to hold a job. Her

migraine headaches are substantial and make it very difficult for her to work on those days. In my opinion, she is disabled due to her medical conditions.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Raymond Souza entered his opinion on July 25, 2014 (Tr. at 14-26). Plaintiff's last insured date was March 31, 2015 (Tr. at 16).

Step one. Plaintiff has not engaged in substantive gainful activity since her alleged onset date (Tr. at 16).

Step two. Plaintiff has the following severe impairments: seizure disorder, irritable bowel syndrome, celiac disease, asthma, hypothyroidism, migraine headaches, degenerative joint disease of the left shoulder, and depression (Tr. at 17).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17-19).

Step four. Plaintiff maintains the residual functional capacity to perform light work except that she can only occasionally climb ladders, ropes or scaffolds; can occasionally reach forward or overhead with her left arm; she must avoid concentrated exposure to irritants such as fumes, odors, dust and gases. She must avoid all use of hazardous machinery and all exposure to unprotected heights. She is limited to simple, routine, repetitive tasks with an SVP level no greater than 2. There can be no strict production quotas with an emphasis on a per shift rather than per hour basis (Tr. at 19-20). With this residual functional capacity, plaintiff is unable to return to her past relevant work (Tr. at 25).

Step five.  Plaintiff is capable of adjusting to other work available in significant numbers such as counter clerk, furniture retail clerk, and shipping/receiver layer (Tr. at 26).  Therefore, plaintiff is not disabled (Tr. at 26).

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff can work because:

> Given the need for the Plaintiff to take rest periods during the day and occasion[ally] to spend the entire day in bed, she cannot perform the requirements of light work as found by the ALJ. . . .  The Plaintiff testified that multiple times a month she would lie down for 4 hours in a day due to auras. She also had two to three days a week that were bad days and she was in bed all day.

(plaintiff's brief, p. 6).

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p[7] encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Plaintiff's testimony that she needs to take rest periods during the day, occasionally stay in bed all day, or lie down for up to four hours at a time due to auras is not supported by the record.

The ALJ pointed out that although plaintiff reported to her physicians that she was previously diagnosed with fibromyalgia, she was not officially diagnosed by any

---

[7]SSR 96-7P was superseded by SSR 16-3p on March 16, 2016 (see 81 F.R. 14166-72); however, the ALJ's opinion was entered prior to that change.

doctor after her alleged onset date. She does not have at least 11 of 18 trigger point findings to objectify her alleged condition, and the medical records do not support a finding of widespread pain throughout all quadrants of the body (Tr. at 17).

With respect to plaintiff's testimony that she has seizures, she has auras that result in slurred speech and blind spots, she has migraines which cause vomiting and result in her staying in bed all day, she is off balance and forgetful, she has concentration problems and cannot stay on task or find the right word, and that due to her irritable bowel syndrome she has to use the restroom four to five times a day, the ALJ noted that the medical records show that plaintiff required epileptic and migraine medication but she reported good control of her seizures. She reported continued headaches but indicated they were improved with BOTOX. Plaintiff had normal exams, her doctor questioned her medication compliance, and plaintiff's doctors have consistently found normal memory and concentration. Her examinations have revealed no obvious impairments, and her gait and balance have always been normal. Plaintiff has never shown signs of dizziness, vertigo, lightheadedness or other sensory disturbances. The ALJ found "little objective evidence, both prior to and after the claimant's amended alleged onset date, to suggest that the claimant's seizures or migraines have been as frequent and limited as alleged." Plaintiff has not required emergency care for her conditions and has not been treated at hospitals. Rather, her conditions have been managed through routine care and regularly scheduled follow-up visits with her doctors. The ALJ further noted that plaintiff's testimony that she has to use the restroom four to five times a day is not supported by the medical records.

22

The ALJ noted that plaintiff continues to drive suggesting that her seizure activity is well controlled. Finally, plaintiff's work history is steady; however, "she rarely earned over the yearly threshold for substantial gainful activity suggesting that she was not in the habit of performing full time work even prior to her amended alleged onset date." (Tr. at 24).

The ALJ's findings are well supported in the record. Plaintiff's medical records which predate her alleged onset date by a year show that she complained of experiencing headaches more than 15 days per month, each lasting at least 4 hours. During that time, her doctor gave her regular BOTOX injections and occipital nerve blocks. Plaintiff stayed on the same medications that entire time. An ALJ in her previous disability case found her not disabled during that time, a finding that was not appealed. There is nothing in the medical records of this case suggesting that plaintiff's condition is any worse than it was prior to the first ALJ's opinion.

A careful review of plaintiff's medical records shows that she generally reported seizures only to doctors and nurse practitioners who were not treating her for that condition. For example, she told nurse Gulino on September 6, 2012, that she was trying to get disability due to seizures, but Ms. Gulino was treating plaintiff for a sinus infection. She told Dr. Pineda on January 8, 2013, that her seizure medication was not working, but Dr. Pineda treated plaintiff for irritable bowel syndrome. On September 18, 2013, she told Dr. Pineda that she was still having some seizures, but again he was seeing her for irritable bowel syndrome.

Case 2:15-cv-04275-REL   Document 27   Filed 03/27/17   Page 23 of 26

During that same time, on December 19, 2012; March 20, 2013; September 25, 2013; and December 30, 2013, she reported no seizures to nurse Samuels and Dr. McLaren, both of Neurology, Inc., where plaintiff was being treated for seizures. The only time she reported a seizure to anyone at Neurology, Inc., was when the battery in her VNS had gone dead, and that was clearly not a full-blown seizure because plaintiff continued to drive and knew it was illegal to do so for six months after a seizure.

Plaintiff told Dr. Pineda on September 18, 2013, that she was still having some seizures, but one week later when she saw her neurologist Dr. McLaren, she said she was having no seizures and that seizures were "not a problem." Plaintiff told nurse Samuels on April 1, 2014, that she had a seizure a week ago, yet 2 1/2 months later she testified at her hearing that she had been driving and that she knew she was not supposed to drive for six months after having a seizure.

On June 2, 2014, plaintiff denied diarrhea, dizziness, vertigo, lightheadedness, fainting, decrease in concentration, confusion, disorientation, memory lapses or loss, convulsion, focal disturbances, speech difficulties, problems with balance or coordination, depression, and sleep disturbances. Her concentration was noted to be normal, her memory was unimpaired, her speech was normal, her gait was normal, her coordination was normal, and her attention was normal. However, 8 days later she testified that she had to use the bathroom four to five times a day and that she experienced dizziness, problems with concentrating, problems with confusion, memory problems, speech problems, balance problems, and sleep problems. The fact that she

24

denied these symptoms to her treating doctor about a week earlier supports the ALJ's decision to find plaintiff's testimony not entirely credible.

The medical records show that plaintiff consistently denied problems with concentration, memory, speech, and balance. The observations of plaintiff's treating doctors and nurses were consistently normal with respect to plaintiff's memory, concentration, speech and balance. Her physical exams were consistently normal. The record supports the ALJ's finding that plaintiff's allegations regarding these symptoms were not entirely credible.

Finally, there are no references in any of plaintiff's medical records to plaintiff's having to spend entire days in bed. As the ALJ noted, she never needed to go to an emergency room due to a migraine that would not respond to her regular treatment. She did not require non-routine visits to her treating doctors due to headaches, seizures or other symptoms. Her treatment consisted of routine medical care of medications, BOTOX injections, and occipital nerve blocks, suggesting that her treatment regimen adequately controlled her symptoms. If an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010); Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009).

Only credible limitations should be included in a claimant's residual functional capacity. 20 C.F.R. § 404.1529(a). Because the omissions in her residual functional capacity assessment were properly found not credible by the ALJ, he did not err in neglecting to include those limitations in his residual functional capacity assessment.

### VII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 27, 2017